OPINION OF THE COURT
Edward H. Lehner, J.
This is a petition to invalidate the independent nominating petition of Frank J. Bárbaro as a candidate for Mayor of the City of New York in the general election to be held November 3, 1981. The petition as filed contained 40,050 signatures. The candidate for Mayor nominated by the Liberal Party has challenged the petition on various grounds that she believes reduces the number of valid signatures to below the 7,500 required by section 6-142 (subd 2, par [b]) of the Election Law.
PROCEEDINGS PRIOR TO TRIAL
The first day for gathering nominating petitions for an independent candidacy was August 4 (Election Law, §6-138, subd 4) and the last day for filing was September 15 (Election Law, § 6-158, subd 9). The primary was scheduled for September 10 but because of a Federal court ruling, was postponed until September 22, which date was fixed by the Legislature at a special session convened on September 16. Said session also extended the time to file specifications to objections to independent petitions until October 2.
Subdivision 2 of section 6-154 of the Election Law requires objections to a petition to be submitted within three days after the petition is filed, with specifications due six days thereafter. Here, no objections were ever filed with the Board of Elections (Board).
In the case of an “aggrieved candidate”, however, the failure to file objections does not prevent the candidate from establishing in court that the petition is invalid. (Election Law, § 16-102; Matter of Loucky v Buchanan, 49 AD2d 797.)
In a companion case, petitioner sought to have the Board perform a line-by-line examination to determine the validity of each of Barbaro’s 40,050 signatures. I dismissed such petition on October 21 (Codd v Board of Elections, NY County, Oct. 21, 1981, Index No. 21551/1981, Lehner, J.).
*137 On October 16 after certain preliminary hearings were held before the Referee on the issue of jurisdiction and other matters relating to the companion case, a conference was had among the attorneys for the parties, the Referee and the court. Pursuant to agreement, petitioner was to present for trial on Monday, October 19, claims with respect to the validity of signatures gathered by notaries and by 10:00 a.m. on Tuesday, October 20, a bill of particulars of the challenges was to be furnished, which were to be checked promptly by respondent, and the trial was to proceed expeditiously before Referees in three counties. The Board was ordered opened by me during the weekend and until 10:00 p.m. and in some instances until midnight on all days except Sunday when it was to remain open until 5:00 p.m.
Such bill of particulars was delivered when promised and the petitioner then for the first time specified her detailed objections to the petition. Her prior bill listed each and every signatory as being not registered, having signed a prior petition and having voted in the primary and was properly treated as a nullity by the Referee.
With the general election scheduled for November 3 and the Board obligated to deliver the enrollment books to the polling places, the trial by necessity had to be terminated by Friday, October 23. The court finds that any prejudice suffered by petitioner as a result is due, in large part, to her tardiness in submitting objections. Petitioner claims that the delay was due to the fact that many of the enrollment books were not returned to the central boards until October 5. Even if that were true, which respondent claims is not the fact, petitioner could have done almost all of the preparation from secondary sources available at the Board.
Also, petitioner claims that certain designating petitions filed by Barbaro in the primary were not available for examination. It appears that certain petitions listing candidates for other offices were involved in litigation relating thereto and hence were not at the Board. However, the court finds that any prejudice resulting therefrom is attributable to the petitioner not requesting same of the Board until some time during the week of October 19. Although *138 there was some dispute as to when the request was made, the court believes the representations on this issue made by the executive director of the Board and its counsel.
referee’s report
The Referee co-ordinating the hearings in the various counties, submitted his final report on Monday, October 26, and lengthy arguments were presented on that day by both parties on motions to confirm and disaffirm. Also, at the request of the court, the executive director of the Board appeared to answer inquiries on certain aspects of the claims.
The report shows 6,866 total valid signatures, recommends sustaining the validity of an additional 9,185 signatures obtained by witnesses who voted in the primary, and concludes that this proceeding should therefore be dismissed.
JURISDICTION
Barbaro has claimed that the court lacks jurisdiction because service was improper. In his interim report dated October 16, 1981, the Referee agreed with such position.
The order to show cause herein signed on September 28, by Justice Hughes directed that service of the order and petition be made upon Mr. Barbaro personally or by either leaving copies at his place of residence with a person of proper age and discretion and “affixing a copy thereof to the outer door of said residence”. After the Referee’s report was submitted the parties stipulated that the above use of the conjunctive was a typographical error and that the disjunctive was intended.
The person who effected service (who was not a professional process server) testified before the Referee that he went to the apartment building in which Mr. Barbaro resides on September 28, the day the order was signed and the last day on which to effect service, but was unable to obtain admission. He stated that he received no response on ringing the intercom bell for the apartments of both Mr. Barbaro and the superintendent. He returned to the building an hour later after unsuccessfully seeking to serve Mr. Barbaro at his office. As a result of again being unable to *139 obtain admission, the papers were taped to the wall above the intercom bells which are two to five feet from the front door. The reason he gave for not affixing the documents on the entrance door was that it was made of glass and he did not believe the tape would stick with the result that the papers might fall off as a consequence of traffic going through the entrance.
Mr. Barbaro testified that although the papers were attached to the wall at the building’s main entrance, he generally uses another entrance and did not learn of the service until September 30, when a friend called it to his attention.
Mr. Barbaro’s attorney argued that the process server was obligated, in one manner or another, to gain entrance to the building and place the petition on Barbaro’s apartment door.
The court finds that no improper means are required to obtain admission and if the front entrance was as far as the process server was able to proceed using due diligence it is proper to leave the papers at the entrance.
In DuPont, Glore Forgan & Co. v Chen (41 NY2d 794, 797) service under CPLR 308 (subd 2) was permitted upon an apartment building doorman, the court holding that “the outer bounds of the actual dwelling place must be deemed to extend to the location at which the process server’s progress is arrested”. See, also, Marrero v Wolffe (60 AD2d. 596) where service at the main entrance of defendant’s residence was held valid, and Evans v Sedgwick (66 AD2d 700) where the court indicated that service nailed to the apartment door was mandated unless the process server was “stopped at the door of the apartment building”.
Under the circumstances, considering he had only a few hours before the jurisdictional deadline to effect service would pass, I find that the process server acted diligently in attempting to obtain entrance to the building.
I further find that leaving the papers above the intercom bells was proper. The law, unlike baseball, is not “a game of inches”. Leaving the papers a few feet from the main entrance is at least as appropriate as attaching them to the *140 front glass door where passersby are more likely to cause them to be removed without being received by respondent.
Thus, the court finds that service was in compliance with the order and jurisdiction obtained.
BURDEN OF PROOF
In connection with the challenges it should be borne in mind that a petition that “appears to bear the requisite number of signatures” is presumptively valid. (Election Law, § 6-154, subd 1.) A person claiming invalidity has the burden of proving such claim. (Matter of Acosta v Previte, 51 AD2d 960, affd 39 NY2d 720.)
CLAIMS OF PETITIONER
In its bill of particulars petitioner has claimed the invalidity of all but 4,954 of the signatures filed. The following are the general classifications of the items in issue between the parties:
1. WITNESSES NOT REGISTERED AS OF AUGUST 4 (2,816 SIGNATURES)
Section 6-138 of the Election Law specifies that the persons who can sign independent nominating petition must have been registered to vote prior to the first day for signing such petitions. Section 6-140 states that a witness must be a voter “who also is qualified to sign the petition.” Since the witnesses to 2,816 signatures were not qualified to vote on August 4,1981 (the first day for circulating such petitions), the signatures obtained by them may not be counted.
2. WITNESSES WHO VOTED IN THE PRIMARY (9,185 SIGNATURES)
Subdivision 1 of section 6-138 of the Election Law provides that a person may not be counted as a valid signature if he voted “at a primary election where a candidate was nominated for an office for which such petition purports to nominate a candidate”. Since, as indicated above, a person may only witness an independent petition if he is qualified to sign it, petitioner claims that signatures obtained by witnesses who voted in the September 22 primary are invalid.
*141 In the case at bar, the petitions were filed on September 15. Hence, at the time of filing witnesses could not have voted in a primary. Petitioner is thus claiming that 9,185 signatures valid when witnessed and filed became invalid when witnesses to those signatures voted on September 22.
To decide this issue requires an examination of the history of this provision.
Prior to July, 1971, to act as a witness to an independent petition one merely had to be a registered voter and did not have to reside in the “same political unit for which the nomination is made” (Election Law, § 138, subd 3, in effect prior to July 2, 1971). On that date, chapter 1093 of the Laws of 1971 became effective and made qualification of independent candidates more difficult. The section was changed to require that the witness be a “duly qualified voter of the state qualified to sign the petition”. Such provision was slightly amended by the recodification (L 1976, ch 233, as amd by L 1976, ch 234, eff Dec. 1,1977) in section 6-140 to read as follows (the italicized words having been added thereby): “a duly qualified voter of the state and who also is qualified to sign the petition.”
The cases cited by petitioner do sustain the position that the statute invalidates signatures of persons who had previously voted at a primary and that it is constitutional to do so (Socialist Workers Party v Rockefeller, 314 F Supp 984, affd 400 US 806), and that th§ statute also invalidates signatures of persons where only the witness voted in a prior primary (Matter of Fuchsberg v Lomenzo, 42 AD2d 1002, affd 33 NY2d 718). The theory supporting constitutionality of this limitation is stated to be that the Legislature can validly limit a voter to a single say as to who will be on the November ballot, a so-called “one man one vote concept”.
An examination of the statute, however, will show that if there is such a legislative concept, it has not been consistently enacted. For example, an alternative method of obtaining signatures is through use of a notary public or commissioner of deeds. Subdivision 2 of section 6-140 of the Election Law permits such a person to witness a signature without any of the restrictions referred to above. It would *142 seem that permitting a person who happens to hold a notary public license (any lawyer can obtain one on request) to have “two votes” in the primary process, while everybody else is limited to “one vote” comes very close to an equal protection violation of the Constitution.
The determination of this issue, contrary to the allegation of the petitioner, has not been definitively decided. The Social Workers Party case (supra) was decided before 1971 when, as shown above, a witness was not disqualified for having voted in a primary. In the Fuchsberg case (supra), decided in 1973, although it was specifically stated that the signatures obtained by a witness who voted in a prior primary were invalid, it does not appear that the constitutional issue was raised.
Moreover, the cases cited upholding this section have dealt with situations where the primary was held in the spring before independent petitions could be circulated. Spring primaries were held from the mid-60’s through 1973. Since 1974 we have had September primaries (except for election of delegates to national conventions) where the period for circulating independent petitions began before the primary and ended after it. In such situations petitioner claims that persons who signed petitions prior to the primary before a witness who subsequently voted in the primary cannot be counted. To me such retroactive disqualification of signatures would seem constitutionally questionable. Counsel have indicated that they have not found any authorities approving the striking of signatures obtained by witnesses who thereafter voted in a primary. The court’s independent research has not located any such case.
The case at bar presents a stronger case for upholding the validity of the signatures as here the petitions had been filed seven days before the primary which was held after the period to file objections had expired. Should the signatures of persons who were registered, did not sign another petition and did not vote in the primary have their request to nominate a candidate for the November election rejected because the person to whom they made their request by signing a petition, although duly registered and not a prior petition signer, was not a notary and subse *143 quently voted in the primary? If such inquiry is answered in the affirmative, would we not be adopting a rule of “one man no vote”?
Although I would think that such a result would be an unconstitutional application of a State statute to deprive a candidate to a position on the ballot (Social Workers Party v Rockefeller, supra, p 989; Reynolds v Sims, 377 US 533, 555), aware of the admonition that lower courts should decide cases on other grounds when possible, I do not decide that issue.
Instead, I follow, as a matter of statutory interpretation, the decision of the Fourth Department in Matter of Lily v Mahoney (59 AD2d 823), where independent petitions were filed August 25 for the office of Mayor of the City of Buffalo. Special Term ruled petitioner off the ballot because certain signators subsequently voted in the primary held on September 8. In reversing, the court said (p 823) with respect to the provision of the Election Law that was similar to current section 6-138: “The criteria provided by this section for persons who are qualified to sign independent nominating petitions are those that must exist on the date the petition is signed *** The signatures were not invalidated by the subsequent actions of the signators.>?
In argument against adoption of the rule in the Lily case (supra), petitioner asserts that a petition signer can never be sure that his signature will be counted as a witness may never file the petition sheet or may improperly complete the witness’ statement with the result that the sheet will not be counted.
The court perceives a significant difference between a situation where the filing mandates of the law are not complied with and the case here where the filing is proper but the purported invalidating act occurs after the time to file objections has expired.
Believing that the Lily case (supra) makes a great deal of sense in that the retroactive invalidation of a properly filed petition is unjust and not mandated by statute, the court finds the signatures of 9,185 persons who signed before witnesses who later voted in the primary are valid.
Another case of interest on this subject is Matter of Boal v Hayduk (68 Misc 2d 234, affd 37 AD2d 860). There the *144 Appellate Division affirmed without opinion a decision that held that the provision that persons who signed another nominating petition should not be “counted” did not invalidate the signatures of persons who signed before a witness who had signed another petition. The court held that to be a witness under the aforesaid 1971 amendment one only had to be a registered voter who resided in the political unit for which the nomination is to be made. The status of this decision, however, may be questioned by reason of the Court of Appeals affirmance without opinion in the Fuchsberg case (42 AD2d 1002, affd 33 NY2d 718, supra).
3. SIGNATURES ON SHEETS IN VOLUME WHERE PAGE 126A WAS INSERTED BETWEEN PAGES 126 AND 127 (360 SIGNATURES)
Petitioner seeks to invalidate all 360 signatures after page 126 in a volume containing approximately 170 pages because page 126A is contained therein between pages 126 and 127.'
The court finds that the foregoing presents no substantial violation of the law requiring that pages be “consecutively numbered”. (See Matter of Lamula v Power, 13 NY2d 873; Matter of Pavis v Heffernan, 185 Misc 626, affd 269 App Div 912.)
Hence the 360 signatures are valid.
4. “streetcorner” petitioning (13,000 signatures)
Petitioner claims that approximately 13,000 signatures were obtained through “street corner petitioning” with the result that the petitions were not in any order by county and hence difficult to verify and thus invalid. Her reliance on Matter of Contessa v McCarthy (40 NY2d 633) in support of this position is misplaced. There the statute, dealing with candidates to be voted upon by all voters in the State, specifically required that volumes be segregated by congressional district. No such provision applies to other elections. Hence, the challenge is not sustained.
5. SIGNATURES OBTAINED BY DELORE ROBINSON (282 HELD VALID, 727 HELD INVALID)
*145 On October 16, petitioner’s counsel represented to the court that he had been informed that the registration card of subscribing witness Delore Robinson, whom petitioner had challenged as being “not registered”, had been removed from the book by the Board prior to the examination and, replaced subsequent thereto, with the result that petitioner did not review the signatures of the individual signers because of the belief that Ms. Robinson was not registered. I ruled that if such were in fact the case, to be established by testimony before the Referee by Board officials, the individual signatures, even though not previously objected to, could then be challenged. Contrary to the information which had been supplied to petitioner’s counsel, it developed that Ms. Robinson had registered on July 24, 1981 and that her card, similar to those of all recent registrants, was in the front of the registration book. Even though the representation was inaccurate (through no fault of counsel), I nevertheless requested the Referee to make a line-by-line examination of the 1,009 signatures obtained by such witness. Rather than perform an entire review of such signatures the Referee, because of the time limitations referred to above, applied a percentage of valid signatures based on an examination of a limited sample and ruled 282 (28%) valid and 727 (72%) invalid.
After listening to argument and determining that the court should not invalidate signatures on grounds other than those on which petitioner made specific objections, the court rules that all 1,007 signatures are valid. This is consistent with the rulings of the Referees, which the court confirms, that signatures should not be invalidated other than on specific grounds contained in the bill of particulars. If a specific objection to a subscribing witness is overruled, the individual signatures are not subject to challenge unless the subject of a listed specific objection.
6. INDIVIDUAL SIGNATURES NOT EXAMINED (15,000 SIGNATURES)
The most difficult problem presented to the court in this case is how to deal with individual signatures specifically objected to by petitioner but never ruled upon by the Referees because of time constraints. I am informed that *146 this total comes to approximately 15,000 signatures with about 6,000 in Manhattan and 9,000 in The Bronx. In this connection the court had the following options:
1. direct a continuation of the trial until all signatures were examined which would have as a matter of necessity required the court to stay the election;
2. declare that the petitioner has failed to sustain her burden of proof and declare all unexamined signatures valid, or;
3. permit validity of signatures to be determined by means of a sample.
The court without hesitation rejected the first option. There has been enough judicial interference already this year with the electoral process and neither party herein sought a stay of the election. If such a stay is to be issued, it should be by an appellate court.
Although respondent has urged that all signatures not examined be declared valid, the court chooses not to do that in light of the Referee’s finding in his report that “both sides acted in good faith and expeditiously in the trial of this case.” Even though as indicated above, the court with its more distant review of the happenings might not wholeheartedly agree with that conclusion, I think it is entitled to weight as the person rendering it was the one most intimately involved in the trial.
I have therefore come to the conclusion that the only practical solution to the problem is to apply a sample employing the limited line-by-line review by the Referees. In so deciding, I am not unware of the decision of the Second Department in Matter of Ryan v Sadowski (71 AD2d 938, 939) in which the court (at the urging of the same law firm representing the petitioner herein) ruled that a sampling method is improper and that the trial “should not have been terminated without a full review of all the signatures.” That decision was rendered at a date approximately three weeks prior to a primary for election of a Judge of the Civil Court. The shorter period remaining before the upcoming election and the much greater number of signatures involved herein distinguish the present situation.
*147 The court therefore will permit the validation of a percentage of said 15,000 individual signatures based on the very limited sampling of actual line-by-line objections. The court adopts this position even though both parties oppose its use.
The following is a breakdown of the results of the line-by-line examinations in the two counties affected:
COUNTY NUMBER EXAMINED VALIDATED
Bronx 278 29
Manhattan 166 24
444 53
This results in a percentage of validation of 12%. Although the court is not unmindful of and is distressed by the minute size of the sampling (3%), it feels that it has no alternative and thus validates an additional 1,800 signatures (12% x 15,000).
SUMMARY OF VALID SIGNATURES
Validated by court — paragraph 2 in decision 9,185
Validated by court — paragraph 3 in decision 360
Validated by court — paragraph 5 in decision 727
Validated by court — paragraph 6 in decision 1,800
Not objected to by petitioner 4,954
Validated by Referee in Manhattan per report 1,504
Validated by Referee in Bronx per report 29
Validated by Referee in Queens per report 379
Total signatures validated 18,938
In light of the above, the petition is dismissed.